1  E. MARTIN ESTRADA
   United States Attorney
2  DAVID T. RYAN
   Assistant United States Attorney
3  Chief, National Security Division
   KEDAR S. BHATIA (Cal. Bar No. Pending)
4  Assistant United States Attorney
   Terrorism and Export Crimes Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-4442
7       E-mail:   kedar.bhatia@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

9

10                  UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,          No. 2:24-mj-7256-DUTY

13              v.                     GOVERNMENT'S MEMORANDUM OF LAW IN
                                       SUPPORT OF ITS APPLICATION FOR
14  YINPIAO ZHOU,                      REVOCATION OF RELEASE ORDER AS TO
                                       DEFENDANT YINPIAO ZHOU
15          Defendant.

16

17       The government hereby files this memorandum of law in support of

18  its application for revocation of release order as to defendant

19  Yinpiao ZHOU pursuant to 18 U.S.C. § 3145. After being charged by

20  Complaint in this district, ZHOU was arrested on December 9, 2024, in

21  San Francisco, California, and had his initial appearance the next

22  day in the United States District Court for the Northern District of

23  California. On December 10, 2024, the Hon. Sallie Kim, United States

24  Magistrate Judge, ordered defendant released pending trial subject to

25  certain bail conditions. *See* Case No. 3:24-mj-71740 (N.D. Cal.), Dkt.

26  2.

27

28

1   The government relies on the attached memorandum of points and

2  authorities, accompanying exhibits, the files and records in this

3  case, and such further evidence and argument as the Court may permit.

4

5  DATED: December 12, 2024          E. MARTIN ESTRADA
                                     United States Attorney

6

7                                    DAVID T. RYAN
                                     Assistant United States Attorney
                                     Chief, National Security Division
8

9                                     ___/s/_____
                                     KEDAR S. BHATIA
10                                   Assistant United States Attorney
                                     Terrorism and Export Crimes Section
11

12                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................i

I.   INTRODUCTION.................................................1

II.  STATEMENT OF FACTS...........................................2

III. Procedural History..........................................6

IV.  ARGUMENT....................................................8

     A.   Legal Standard.........................................8

     B.   Defendant Should Be Detained Pending Trial.............9

          1.   If Released, ZHOU Poses A Substantial Risk Of
               Flight And No Conditions Or Combination Of
               Conditions Adequately Mitigate The Risk Of Flight...10

          2.   If Released, ZHOU Poses A Risk Of Danger To The
               Community And No Conditions Or Combination Of
               Conditions Adequately Mitigate The Risk Of Danger...14

V.   CONCLUSION..................................................15

i

**TABLE OF AUTHORITIES**

*United States v. Castaneda*,
No. 18-cr-47-BLF-1, 2018 WL 888744
(N.D. Cal. Feb. 14, 2018)........................................ 12

*United States v. Dagesian*,
No. 2:21-cr-00057-MCS, 2023 WL 2061934
(C.D. Cal. Feb. 15, 2023) ........................................ 12

*United States v. Diaz-Hernandez*,
   943 F.3d 1196 (9th Cir. 2019) .................................. 8

*United States v. Evans*,
   62 F.3d 1233 (9th Cir. 1995) ................................... 9

*United States v. Gebro*,
   948 F.2d 1118 (9th Cir. 1991) .................................. 9

*United States v. Hir*,
   517 F.3d 1081 (9th Cir. 2008) ........................ 10, 12, 13

*United States v. Koenig*,
   912 F.2d 1190 (9th Cir. 1990) .................................. 9

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) .................................. 9

*United States v. Tortora*,
   922 F.2d 880 (1st Cir. 1990) .................................. 13

*United States v. Townsend*,
   897 F.2d 989 (9th Cir. 1990) .................................. 11

*United States v. Winsor*,
   785 F.2d 755 (9th Cir. 1986) ................................... 8


Statutes and Rules

18 U.S.C. § 3142 ............................................... 8, 9
18 U.S.C. § 3145 ............................................... 1, 9
18 U.S.C. § 1503............................................... 7
18 U.S.C. § 1510............................................... 7
18 U.S.C. § 1512 .............................................. 7
Fed. R. Crim. P. 5(c)(3) ....................................... 6

1                    **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.   INTRODUCTION**

3        Defendant Yanpiao ZHOU should be detained pending trial because

4   there are no conditions or combinations of conditions that could

5   adequately mitigate the risk of flight and could reasonably assure

6   the safety of the community.

7        On November 30, 2024, ZHOU, age 39, traveled to a park near

8   Vandenberg Space Force Base ("VSFB") and used a hacked drone to fly

9   over and photograph sensitive areas of the Air Force facility for

10  approximately 59 minutes. Notably, on that same day, November 30,

11  2024, a sensitive payload developed for the National Reconnaissance

12  Office had been launched to orbit by a space contractor.

13       After military personnel detected the drone inside VSFB's

14  restricted airspace, investigators traveled to the park and contacted

15  ZHOU and another individual ("Individual-1"). ZHOU initially denied

16  seeing any drone pilots but later revealed that he had the drone

17  inside his jacket. The drone inside ZHOU's jacket was the same drone

18  that flew over VSFB for an hour.

19       After being advised of his *Miranda* rights and agreeing to speak

20  with agents, ZHOU admitted he flew his drone from the park to take

21  photographs of VSFB. ZHOU further admitted that he downloaded

22  specific software onto the drone to bypass the drone's built-in

23  restrictions to prevent it from taking off and flying in no-fly

24  zones. ZHOU said he knew taking photographs of the space contractor

25  facility at VSFB was "probably not a good idea."

26       A search of the drone pursuant to a federal search warrant

27  revealed several photographs of VSFB taken from an aerial viewpoint

28  on November 30, 2024. A search of ZHOU's cellphone pursuant to the

                                        1

1   same federal search warrant showed that ZHOU did a Google search

2   approximately a month earlier for the phrase "Vandenberg Space Force

3   Base Drone Rules" and messaged with another person about hacking his

4   drone to allow it fly higher than it could otherwise.

5         ZHOU is a citizen of the People's Republic of China and most

6   recently traveled to the United States on February 12, 2024. He was

7   scheduled to return to China on December 9, 2024, via San Francisco

8   International Airport and was arrested on that date at the airport.

9         No conditions can adequately mitigate ZHOU's risk of pretrial

10  flight or the danger to the community. Importantly, the government is

11  aware of no current ties between ZHOU and the United States, and

12  certainly none sufficient to keep ZHOU in the United States when he

13  primarily lives in China. The United States and China do not have an

14  extradition treaty. There are no conditions or combination of

15  conditions that could adequately mitigate the risk of flight because

16  the only thing he is facing in the United State is a felony

17  conviction, given the strength of the evidence, and a term of

18  imprisonment. Under the preponderance standard for the risk of

19  flight, the Bail Reform Act calls for detention in this case.

20        While the risk of flight is more pronounced in this case, ZHOU

21  also poses a risk of danger to the community, given his serious

22  offense and the planning and sophistication that went into it.

23        Accordingly, the Bail Reform Act calls for ZHOU to be detained

24  pending trial.

25  **II.    STATEMENT OF FACTS**

26        On the morning of November 30, 2024, drone detection systems at

27  Vandenberg Space Force Base detected an unmanned aerial system ("UAS"

28  or "drone") flying over the base. *See* Complaint (Dkt. 1) ¶ 19(a). One

1   of the drone detection system identified the UAS as a DJI model Mavic

2   2 UAS, bearing a particular drone identification number (the "DJI

3   Drone"). *Id.* ¶ 19(b). Another drone detection system indicated that

4   the DJI Drone appeared to originate from Ocean Park, a publicly

5   accessible park adjacent to VSFB. *Id.* The drone then traveled south

6   toward a space launch complex that had been used, earlier that day,

7   to launch a payload for the National Reconnaissance Office. *Id.*

8   ¶¶ 19(b)-(d). The drone then returned to the vicinity of Ocean Park.

9   *Id.* The drone flew for a total of approximately 59 minutes and

10   traveled to a height of approximately one mile above ground level.

11   *Id.* ¶ 19(c).

12      After detecting the DJI Drone, VSFB Security Forces traveled to

13   Ocean Park to investigate the drone travel. *Id.* ¶ 20(a). There,

14   Security Forces personnel saw two individuals, ZHOU and Individual-1,

15   and asked to speak to them. *Id.* When Security Forces personnel

16   started talking, ZHOU and Individual-1 walked away. *Id.* Security

17   Forces personnel again asked to talk to ZHOU and Individual-1, who

18   stopped and began speaking to them. *Id.* The personnel then asked if

19   ZHOU and Individual-1 had seen any drones flying nearby and, if so,

20   whether they had seen the pilot. *Id.* ZHOU stated that he had seen a

21   drone but falsely stated that he did not see the pilot. *Id.*

22      While ZHOU and Individual-1 were speaking to Security Forces

23   personnel, ZHOU had his hands inside his jacket. *Id.* ¶ 20(b).

24   Security Forces personnel asked ZHOU to remove his hands from his

25   pocket. *Id.* After they did that, ZHOU removed his hands, exposing a

26   drone underneath his jacket. *Id.*

27      Security Forces personnel asked ZHOU why he had lied about not

28   seeing the drone pilot, and ZHOU responded that he was afraid because

3

1    he believed that the Security Forces personnel were from the

2    military. *Id.* ¶ 20(d).

3        ZHOU showed Security Forces personnel footage that ZHOU had

4    taken using his drone. *Id.* ¶ 20(e). ZHOU showed the Security Forces

5    personnel the footage on a cellphone device attached to the drone

6    controller (the "ZHOU Cellphone"). *Id.* Upon seeing that the footage

7    consisted of parts of VSFB, Security Forces personnel instructed ZHOU

8    to delete footage of the base from the cellphone and watched ZHOU

9    delete the footage. *Id.*

10        Later that day, FBI agents arrived at Ocean Park and interviewed

11    ZHOU. *Id.* ¶ 21. After being advised of his *Miranda* rights and

12    agreeing to speak to the agents, ZHOU said, among other things, that

13    on November 28, 2024, he and Individual-1 stayed overnight at Kirk

14    Creek campground in the Big Sur area of Monterey County, California.

15    *Id.* ¶ 21(a). ZHOU stated that he tried to fly his drone at their

16    campsite at Kirk Creek, but a park ranger told him not to fly it. *Id.*

17    On November 29, 2024, ZHOU and Individual-1 drove from Kirk Creek to

18    Ocean Park. *Id.* ¶ 20(b).

19        ZHOU acknowledged that in the morning on November 30, 2024, he

20    took photographs of the SpaceX Space Launch Complex with his drone.

21    *Id.* ¶ 20(c). ZHOU stated that he knew the SpaceX facility was on a

22    military installation. *Id.* ZHOU said that his drone flew for 10 or 15

23    minutes and went approximately one to two miles south towards the

24    SpaceX facility. *Id.*

25        ZHOU also admitted he purchased software on a particular website

26    that allowed the DJI Drone to bypass restrictions on altitude as well

27    as no-fly-zone restrictions that would otherwise not allow his DJI

28    drone to fly at VSFB. *Id.* ¶ 20(d). ZHOU understood that drones

1    operating in the United States had to comply with altitude and no-fly

2    limits. *Id.* ZHOU originally downloaded the bypass software in 2019 to

3    get around the no-fly zones in Shanghai. *Id.* Referencing the bypass

4    software and his UAS, ZHOU said, "Normally, if you didn't have that

5    software, it wouldn't be able to take off from here." *Id.*

6         ZHOU also said that he had not registered his drone with the

7    FAA. *Id.* ¶ 20(e). ZHOU said FAA instructions for registering drones

8    were not clear. *Id.* ZHOU was familiar with licensing requirements for

9    operating a UAS in China, but he never himself got a license for his

10   UAS. *Id.* ZHOU was not familiar with specific United States

11   requirements for UAS licensing, but he assumed that there must be

12   some requirements. *Id.*

13        On or about December 4, 2024, the Hon. Alicia G. Rosenberg,

14   United States Magistrate Judge, authorized a warrant to search the

15   DJI Drone, a drone controller seized from ZHOU's car, the ZHOU

16   Cellphone, ZHOU's handheld camera, and two cellphones belonging to

17   Individual-1, as well as storage medium inside the devices.

18        A review of an SD card inside the DJI Drone showed several

19   photographs of VSFB taken from an aerial viewpoint. *Id.* ¶ 25.

20   Metadata for those photographs show they were taken on November 30,

21   2024, and from a location above VSFB. *Id.*

22        A preliminary review of ZHOU's cellphone showed that on or about

23   November 10, 2024, ZHOU searched on Google for the phrase "Vandenberg

24   Space Force Base Drone Rules." *Id.* ¶ 26(a). When an agent later

25   conducted the same search on Google, the agent saw various search

26   results cautioning that drones were not permitted at VSFB. *Id.*

27   Separately, in a conversation on October 22, 2024, ZHOU bragged about

28

hacking his drone so that it could go higher, saying "I hacked my drone. It's not supposed to go that high lol". *Id.* ¶ 26(b).

As noted in the Complaint, ZHOU, age 39, is a Chinese citizen and a lawful permanent resident of the United States. *Id.* ¶ 23; *see also* Exh. C. ZHOU arrived in the country on February 12, 2024. Complaint ¶ 21(g). Individual-1 arrived in the United States on a visitor visa on or about November 26, 2024. *Id.* ¶ 23. Both ZHOU and Individual-1 were scheduled to leave from San Francisco International Airport for return travel to China on December 9, 2024. *See Id.* ¶ 21(g).

**III.   Procedural History**

On December 8, 2024, the Hon. Jean P. Rosenbluth, United States Magistrate Judge, signed the Complaint and an accompanying arrest warrant. On December 9, 2024, FBI agents arrested ZHOU while he was approaching the TSA area at San Francisco International Airport.

On December 10, 2024, an initial appearance was held in the United States District Court for the Northern District of California before the Hon. Sallie Kim, United States Magistrate Judge, pursuant to Rule 5(c)(3) of the Federal Rules of Criminal Procedure. *See* Exh. A (transcript of initial appearance). At the initial appearance, the government sought detention and defense counsel argued for release subject to bail conditions.

The Pretrial Services office in the Northern District of California did not prepare a pretrial services report for the initial appearance. The government understands that this is consistent with

1   that Pretrial Services office's typical practice of not preparing a

2   pretrial services report for an out-of-district arrest.[1]

3        Judge Kim ordered ZHOU released pending trial subject to the

4   following conditions:

- Defendant must appear at all proceedings as ordered by the Court and must surrender for service of any sentence imposed.

- Defendant must not commit any federal, state, or local crime.

- Defendant must not harass, threaten, intimidate, injure, tamper with, or retaliate against any witness, victim, informant, juror, or officer of the Court, or obstruct any criminal investigation. See 18 U.S.C. §§ 1503, 1510, 1512, and 1513, summarized in attachment.

- Defendant must submit to any supervision by Pretrial Services and must report immediately upon release and thereafter as directed to Pretrial Services.

- Defendant must surrender any passports or other travel documents to Pretrial Services by 12/11/24 and must not apply for any other passports or travel documents.

- Defendant must stay away from Vandenberg Space Force Baes and other military bases.

- No possession of drones.

24  *See* Exh. B (release conditions form).

---

        [1] As set forth below, the government is seeking to have a pretrial services report prepared in this District prior to the bail hearing in this matter.

7

1    Judge Kim stayed her release order for a period of 24 hours,

2  *i.e.,* until approximately 11:00 a.m. on December 10, 2024, so that

3  the government could pursue a motion for review. Later on December

4  10, 2024, the government filed the instant Application for Review or

5  Reconsideration of Order Setting Conditions of Release or Detention

6  (18 U.S.C. § 3142) and Request for Hearing (CR-88).

7  **IV.    ARGUMENT**

8      **A.    Legal Standard**

9      The Bail Reform Act of 1984 directs courts to impose those

10  conditions of pretrial release that "will reasonably assure the

11  appearance of the person as required and the safety of any other

12  person and the community." 18 U.S.C. § 3142(c)(1)(B). The Act permits

13  pretrial detention of a defendant without bail where "no condition or

14  combination of conditions will reasonably assure the appearance of

15  the person as required and the safety of any other person and the

16  community." 18 U.S.C. § 3142(e).

17      Courts must consider several factors when determining whether

18  and what conditions are appropriate, namely: (1) the nature and

19  seriousness of the offense charged; (2) the weight of the evidence

20  against defendant; (3) the defendant's character, physical and mental

21  condition, family and community ties, past conduct, history relating

22  to drug or alcohol abuse, and criminal history; and (4) the nature

23  and seriousness of the danger to any person or to the community that

24  would be posed by the defendant's release. 18 U.S.C. § 3142(g);

25  *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

26  Consideration of non-statutory factors is disfavored. *United States*

27  *v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).

28      Detention is appropriate where a defendant is either a danger to

1  the community or a flight risk; it is not necessary to prove both.

2  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A

3  finding that pretrial release will not ensure the appearance of the

4  defendant need only be supported by a preponderance of the evidence.

5  *Motamedi*, 767 F.2d at 1406. A finding that a defendant is a danger to

6  the community must be supported by clear and convincing evidence. 18

7  U.S.C. § 3142(f); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th

8  Cir. 1991).

9        "If a person is ordered released by a magistrate judge . . . the

10  attorney for the Government may file, with the court having original

11  jurisdiction over the offense, a motion for revocation of the order

12  or amendment of the conditions of release[.] The motion shall be

13  determined promptly." 18 U.S.C. § 3145(a); *see United States v.*

14  *Evans*, 62 F.3d 1233, 1237 (9th Cir. 1995). The district court

15  conducts its own de novo review of the magistrate judge's detention

16  order. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990).

17  The district court "should review the evidence before the magistrate

18  and make its own independent determination whether the magistrate's

19  findings are correct, with no deference." *Id.* at 1193.

20        **B.    Defendant Should Be Detained Pending Trial**

21        ZHOU poses a serious risk of flight and a serious danger to the

22  community. No condition or combination of conditions of release could

23  adequately mitigate those risks, and certainly not the conditions

24  imposed by the Magistrate Court. The Bail Reform Act calls for ZHOU

25  to be detained pending trial.

26        As a threshold matter, the government notes that a Pretrial

27  Services report was not prepared in the Northern District of

28  California, apparently consistent with the typical practice in that

9

1    court for out-of-district arrests. The government requests that a

2    Pretrial Services report be prepared in this case prior to the bail

3    hearing so that the Court may benefit from added information about

4    defendant's background, characteristics, ties to the community, and

5    the presence or absence of bail resources.

6              1.    If Released, ZHOU Poses A Substantial Risk Of Flight
                     And No Conditions Or Combination Of Conditions
7                    Adequately Mitigate The Risk Of Flight

8         There is an "unacceptably high risk" that if defendant is

9    released pending trial, he will not appear as required. *See United*

10   *States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008). Because flight is

11   never certain, the Bail Reform Act does not call for detention only

12   if the defendant is certain to flee. Rather, it requires detention

13   where the government shows, by a preponderance of the evidence, that

14   there are no conditions or combinations of conditions that will

15   reasonably assure the defendant's appearance at future proceedings in

16   this felony criminal case. Here, that standard is met and the

17   defendant should be ordered detained pending trial.

18        *First*, the government is aware of no meaningful ties between the

19   defendant and the United States. Defendant received his undergraduate

20   degree from a university in Australia. *See* Exh. A at 8. Based on

21   defendant's interview with agents, the government understands that

22   defendant later studied at the University of North Carolina Chapel

23   Hill between approximately 2012 and 2014. Based on defendant's travel

24   history, he left the United States for China in 2015 and did not

25   return to the United States until February 12, 2024. *See* Exh. C (TECS

26   – Personal Encounter List). Based on defendant's interview, ZHOU was

27   in the United States between February 2024 and his flight to China on

28   December 9, 2024, so that he could look for a job in the United

10

1   States. He intends to return to China but continue to search for a

2   job in the United States.

3       The Ninth Circuit has provided factors that may be considered

4   "[w]hen assessing an alien defendant's ties to the United States" for

5   the purposes of the Bail Reform Act, namely "[1] how long the

6   defendant has resided in this country, [2] whether defendant has been

7   employed in the United States, [3] whether defendant owns any

8   property in this country, and [4] whether defendant has any relatives

9   who are United States residents or citizens." *United States v.*

10  *Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).

11      Defendant fails all of these factors. He does not "reside" in

12  the United States – rather, he appears to be here temporarily while

13  job seeking. And he was arrested while trying to leave the United

14  States for his country of origin, showing that he is *not* tied to the

15  United States. He is not employed in the United States, does not own

16  any property in the United States, and the government is aware of no

17  relatives in the United States. Even if he had some relative here,

18  the more probative question is whether he has a relative here that

19  would somehow mitigate his risk of flight from the instant charges.

20  See, e.g., *Townsend*, 897 F.2d at 996 ("While Mohan has a sister-in-

21  law in Chicago, no evidence was presented concerning the nature of

22  the relationship."). There is no evidence that defendant has the type

23  of close family member in the United States – like a spouse or child

24  – that would be a meaningful deterrent to flight.

25      The Ninth Circuit has recognized that ties to "the community"

26  means connection to the United States *and* the community in which the

27  indictment was brought and where defendant would be required to

28  appear in court. *Townsend*, 897 F.2d at 995. ZHOU appeared to be

1  living temporarily in Northern California and flew out of San

2  Francisco International Airport, showing that he has even fewer ties

3  to the community where charges are pending.

4      *Second*, defendant appears to have established ties abroad that

5  would make it easy to flee and remain abroad. Defendant is a Chinese

6  national. China has no extradition treaty with the United States.[2]

7  Based on his travel history, he has spent almost the entire past

8  decade in China. His significant ties abroad, certainly when compared

9  to his ties to the United States – make him a substantial flight risk

10  regardless of the conditions imposed.

11      There is a separate question of whether ZHOU poses a risk of

12  danger to the community. As discussed below, he does pose a danger.

13  However, the risk danger to the community "usually plays little role

14  in an analysis of the risk of nonappearance." *United States v.*

15  *Dagesian*, No. 2:21-cr-00057-MCS, 2023 WL 2061934, at *3 (C.D. Cal.

16  Feb. 15, 2023) (citing *United States v. Castaneda*, No. 18-cr-47-BLF-

17  1, 2018 WL 888744, at *3 (N.D. Cal. Feb. 14, 2018) ("[T]he Court must

18  be careful not to allow danger to the community to weigh into its

19  assessment of Castaneda's flight risk . . . .").

20      Even if the Court set bail conditions for ZHOU's pretrial

21  release, those limitations – such as electronic monitoring – would

22  suffer from a "critical flaw" in that "they depend on [defendant]'s

23  good faith compliance" in order to be effective. *United States v.*

24  *Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008). In particular, "electronic

25  monitoring does not prevent a defendant from committing crimes within

26

27  _____

28      [2] *See World Population Review*, https://worldpopulationreview.com/country-rankings/countries-without-extradition (last visited Dec. 11, 2024).

1  the monitoring radius," and "there is no reasonable way to assure

2  that a defendant would not make impermissible stops or detours on his

3  way to places permitted under the restrictions." *Id.* at 1092 n.11;

4  *see also United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990)

5  (reversing release order finding that restrictions on communications

6  with any person not approved by counsel, monitoring of phone through

7  pen register, 24-hour house arrest, and other conditions had "an

8  Achilles' heel" because "virtually all of them hinge on the

9  defendant's good faith compliance").

10      Importantly, as described in the Complaint, ZHOU lied to Air

11  Force personnel who asked whether he had seen any drone pilots, and

12  he planned out his crime at least a month ago. Any conditions of

13  release would rely on his good faith compliance, and ZHOU's actions

14  show that compliance is not reasonably assured.

15                            *   *   *

16      ZHOU's lack of any ties to the community make him a serious

17  flight risk. Flight could be domestic to somewhere other than where

18  he is facing court in Los Angeles. Flight could also be abroad to his

19  home in China, where it would be difficult or impossible to secure

20  his return. While defendants in other cases have established ties to

21  the United States through close family members, like a spouse and

22  child, or through long-term employment in the United States, ZHOU has

23  no such ties.

24      At age 39, the only thing ZHOU is facing in the United State is

25  a conviction – given the strength of the evidence – and potentially a

26  term of imprisonment. While the charges in the Complaint are one

27  felony count and one misdemeanor count, which together carry a

28  maximum of four years' imprisonment, the government is continuing to

13

1    investigate whether ZHOU engaged in additional, more serious

2    offenses. Given ZHOU's immigration status, a conviction may also

3    result in his removal from the United States at the end of the

4    criminal process or bar him from becoming a citizen.

5         The government has met its burden of showing by a preponderance

6    of the evidence that, if released, there are no conditions or

7    combination of conditions that will reasonably assure ZHOU's

8    appearance at future proceedings in this case. The Bail Reform Act

9    calls for detention.

10                   2.    If Released, ZHOU Poses A Risk Of Danger To The
                          Community And No Conditions Or Combination Of
11                        Conditions Adequately Mitigate The Risk Of Danger

12        If released, defendant poses a risk of danger to other persons

13    and the community. The risk of danger also calls for detention in

14    this case.

15        Defendant's crime was brazen. As alleged in the detailed

16    complaint, defendant violated the national defense airspace and

17    photographed a military base from the sky. He did it after traveling

18    to the United States for the first time in almost 10 years. At least

19    one month ago, he began planning for his crime, searching on Google

20    for the Vandenberg Space Force Base drone rules. His searched showed

21    him that drones were prohibited, but he was not deterred. He also

22    admitted to agents that years ago he downloaded special software that

23    let him bypass restrictions on altitude and no-fly-zone restrictions.

24        This pre-planning shows a calculated scheme to bypass the rules

25    – using his "hacked" drone – to capture potential defense

26    information. One week ago, he flew his hacked drone over VSFB on the

27    same day there was a payload launch for the National Reconnaissance

28    Office and just a week before he was scheduled to return home to

1   China. If ZHOU had backed up his aerial photographs of VSFB to an

2   online account or some other digital device and is released pending

3   trial, it will be very difficult or impossible to meaningfully

4   restrict his dissemination of those sensitive photographs showing a

5   military base.

6       The brazenness, sophistication, and advance planning of ZHOU's

7   scheme suggest the Court should not be comforted that ZHOU will be

8   reasonably deterred by any bail conditions. ZHOU did not make a

9   youthful mistake or mere accident. This was a planned scheme that

10  risked exposing – and may have exposed – meaningful national security

11  information through aerial photography of an air force base. Any

12  conditions of pretrial release are premised ZHOU's good faith

13  compliance, and his actions in committing the instant crime do not

14  support relying on his good faith compliance to deter flight or

15  danger to the community.

16  **V.    CONCLUSION**

17      For the foregoing reasons, the government respectfully requests

18  that the Court order defendant Yinpiao ZHOU detained pending trial.

19

20

21

22

23

24

25

26

27

28